### HARBAGE v TRACY et

Ohio Common Pleas, Franklin Co

Decided July 28, 1937

554

Gilbert Bettman, Cincinnati, and Agnes B. Dickinson, Columbus, for plaintiff.

Eagleson & Laylin, Columbus, for defendant.

## OPINION

By REYNOLDS, J.

This case is before the court on motion of defendant, J. Freer Bittinger, for judgment in favor of defendants on the pleadings on the issues raised by the cross petition and answer thereto. The question presented grows out of the interpretation of §50, GC, the pertinent part of which is as follows:

"Each member shall receive the legal rate of railroad transportation each way for mileage once a week during the session from and to his place of residence, by the most direct route of public travel to and from the seat of government, to be paid at the end of each regular or special session. If a member is absent without leave, or is not excused on his return, there shall be deducted from his compensation the sum of ten dollars for each day's absence."

Sec 54, GC, provides that:

"The president of the Senate and the speaker of the House of Representatives, shall ascertain the number of days' attendance of each member and officer of the respective houses, during the session, the number of miles to travel of each member to and from the seat of government and certify such attendance and mileage, and the amount due therefor, to the auditor of state."

It is defendant's contention that the members are entitled to be paid the amount of railroad mileage each week from the beginning of the session until its final adjournment, whether the house was actually in session or not, while plaintiff contends that the statute contemplates payment for only such time as the members are actually in session.

Article II, §31, of the Ohio Constitution provides that:

"The members and officers of the General Assembly shall receive a fixed compensation; to be prescribed by law, and no other allowance or perequisite, either in the payment of postage or otherwise; * * *."

It must be held therefore that the payments to members of the General Assembly based on the charge ▉▉▉▉▉▉ ▉ for railroad travel to and from the capitol to their homes are by way of compensation and not a reimbursement for money expended on travel. It is however readily evident that the compensaion is based primarily on the cost of transportation to and from the homes of members. A review of the legislative enactments discloses a purpose to compensate the members for their time, both while attending the sessions of the General Assembly, and in going and coming from and to their homes. At the time of the first enactments on the subject, which was while Ohio was still a part of the northwest territory, the methods of travel were necessarily slow and burdensome, and, with short sessions then had, it was and would be unlikely that members, at least those living at any considerable distance from the seat of government would return home during the session. This is reflected in the first legislative enactments which fixed the compensation at the stipulated rate per day and a like amount for each fifteen miles travel to and from the seat of government, which was shortly thereafter changed to twenty miles, and still later to twenty-five miles, these distances manifestly representing a day's travel for their respective times. This basis of compensation remained in effect until 1880 when under the codification the statute relating to compensation was changed to read:

"Each member of the general assembly shall receive for his term of office the sum of $1,200, one-half thereof to be paid each year, in monthly installments of not exceeding $150 and also twelve cents per mile each way for traveling from and to his place of residence by the most direct route of public travel to and from the seat of government; but if the member is absent without leave or is not excused on his return, there shall be deducted from his compensation the sum of $5 for each day's absence."

It is to be noted that the compensation for time consumed in travel still was based upon the single trip from the home to the seat of government and return.

In 1906 the statute was amended to read that in addition to a salary of one thousand dollars per year, each member was also to receive "twelve cents per mile **each way for traveling not exceeding twice per month** from and to his place of residence, by the most direct route of public travel to and from the seat of government to be paid but once in any regular or special session * * *."

In 1911 still another amendment provides that:

"* * * Each member shall receive two cents per mile each way for **mileage** once a week during the session from and to his place of residence, by the most direct route of public travel to and from the seat of government, to be paid at the end of each regular or special esssion. * * *"

Conditions had changed and with increased facilities for travel it became a comparatively easy matter for members to return to their homes frequently, during the long sessions of the Legislature, and this fact was recognized first by allowing a compensation for that purpose, twice per month and finally for each week during the session.

It can not be successfully argued that under the statute in its present form it would be necessary for the member to actually make the trip to and from his home during the session in order to receive the mileage compensation, for the statute is specific that he is entitled to such compensation each week during the session, the theory no doubt having been, that he could use such compensation in going to his home and return at the week ends, when the Legislature was in recess, or it would compensate him for his time while away from home, but not occupied with the business of the assembly.

The statute providing for this mileage compensation each week during the session, it must be then determined whether there must be actual sittings of the Legislature requiring the presence of the members.

Plaintiff alleges in his petition that on July 22, 1936, the General Assembly voted to take a five minute recess, and the members then went to their homes and did not in fact return to Columbus until December 8, 1936, when an actual session was convened, but that in the meantime there were no sessions, although on December 8th, on motion carried in each branch of the assembly, that entries be made in the journals of the respective bodies to show a convening in session in each, twice each week from July 22nd to December 8th, such entries were in fact so made, and thereafter the proper officers certified to the state auditor mileage compensation for the several members for each week during that time.

Defendants' position is that the journal records of the proceeding are final and their correctness can not be questioned. **Article II, §9 of the state Constitution** provides that:

"Each House shall keep a correct journal of its proceedings, which shall be published, * * *"

and §14 provides that,

"Neither House shall, without the consent of the other, adjourn for more than two days, Sundays excluded; * * *."

It was to comply with this section of the Constitution that the purported records were made.

It is well settled that the validity of any legislative enactment can not be questioned by attacking the correctness of the journal record of the proceedings of either branch of the legislative body. Numerous cases are cited to support defendants' contention that the journal record of legislative bodies can not be questioned, but they are all cases in which questions were raised relative to legislative or governmental proceedings. Here the question is raised relative to a ministerial act. There is nothing sacred about such acts, and no reason of public policy, such as that relating to legislative acts, which would seem to inhibit an examination of the correctness of such acts. On the other hand public policy surely requires that there be some method of attacking the records if and when those records work to the detriment of the public weal.

Since the questioning of the journal records in no way reflects upon legislative enactments but is confined purely to the ministerial acts of certain officers as provided by **§54, GC**, the court holds that for such purpose the records may be questioned, and if the duties prescribed by statute have not been properly carried out the true fact may be shown.

If as a matter of fact no legislative sessions were had between July 22 and De-

cember 8th, there is no reason for the members receiving **mileage** compensation, but if it should be determined that the statute does entitle such payment when there is in fact no session, then the provisions to that effect would be unconstitutional as not of uniform application, since the member at a remote distance would receive a greater compensation than the member near to or at the seat of government, and for doing the same thing, namely, nothing.

The granting of something for nothing is abhorrent to our ideas and ideals, especially when it comes to favors granted to public officials. While there is much abuse of the privilege and position of public office, we still cling to the ideal, at least, that a public office is a public trust, and it should be so regarded, else the confidence and respect which citizens should have in our institutions will be in danger of destruction.

Counsel have been diligent and ingenious, and have filed an exhaustive brief in an endeavor to show that defendants are entitled to compensation whether earned or not, and that the Legislature was in session even though it was not, but the court concludes that the arguments fail when the intention of the Legislature in enacting §§50 and 54 GC is determined as above indicated.

The motion for judgment on the pleadings is overruled.